UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARRY W. MATLOCK,

    Plaintiff,

    v.

DEANGELA LEWIS *et al.*,

    Defendants.

CAUSE NO. 3:19-CV-202-DRL-MGG

OPINION & ORDER

    Barry W. Matlock, a prisoner without a lawyer, proceeds on an Eighth Amendment claim of deliberate indifference towards serious medical needs against Warden Sevier, Nurse Practitioner Kupferberg, Administrator Lewis, and Dr. Jackson for refusing to provide him famotidine free of charge and for refusing to address his inadequate knee braces. He also proceeds on a First Amendment claim against Nurse Practitioner Kupferberg and Dr. Jackson for refusing to treat his knee and for writing him up for insubordination in retaliation for filing a grievance. The defendants filed motions for summary judgment on all claims.

BACKGROUND

    Mr. Matlock resided at the Westville Correctional Facility from March 2018 to July 2019. ECF 84-1 at 1. Prior to his arrival, he had been diagnosed with gastroesophageal reflux disease (GERD) and arthritis in his knees and received famotidine on a regular basis. ECF 1 at 2-3. Dr. Jackson saw Mr. Matlock in March 2018. ECF 84-1 at 2-3. He concluded that Mr. Matlock suffered from only mild heartburn that could be managed

by consuming smaller meals and by avoiding provocative foods, including spicy food, fatty food, and caffeine, but continued Mr. Matlock on famotidine for continuity of care. *Id.* In September 2018, Mr. Matlock told Nurse Practitioner Kupferberg that he experienced heartburn symptoms only when he ate provocative foods or lied on his back. ECF 84-4 at 2-3. She told him that she would continue his famotidine only if his commissary orders confirmed his report that he did not buy provocative foods. *Id.* Mr. Matlock's commissary orders reflected that he had forty-two dollars in his account and spent about sixty dollars each month on commissary goods, including provocative foods. *Id.* In November 2018, Mr. Matlock complained of knee pain, and a nurse advised him on protocol for self-care, gave him bandages, and a temporary bottom bunk pass. *Id.* She also gave him a small box of pain medication and encouraged him to purchase pain medication from the commissary. ECF 84-29 at 50.

On December 30, 2018, Mr. Matlock submitted an informal grievance, stating that he was told to buy famotidine and pain medication from the commissary but that he could not afford to do so and asked for a modified diet. ECF 84-19. Administrator Lewis responded that he had ample funds to purchase medication from the commissary. *Id.* On January 28, 2019, he submitted an informal grievance, seeking medical care for knee pain and stating that his knee brace was stolen during his transfer to the Westville Correctional Facility. ECF 84-21. Administrator Lewis reviewed his medical history, found no order for knee braces, and directed Mr. Matlock to sick call. *Id.* On February 15, Mr. Matlock received new knee braces, though they did not adequately address his knee pain. ECF 1 at 4; ECF 84-9.

On March 5, 2019, Mr. Matlock saw Nurse Practitioner Kupferberg for a chronic care appointment for his high levels of cholesterol. ECF 84-10. According to Mr. Matlock, Nurse Practitioner Kupferberg refused to discuss his knee pain or GERD and told him to leave her office. ECF 1 at 4-5. She also told him "to file a grievance about that, [since] the first one did so much to help [his] pain." *Id.* at 5. He then went around the corner, stood at Dr. Jackson's door, and asked to speak with him because he was Nurse Practitioner Kupferberg's immediate supervisor. *Id.* at 6. Dr. Jackson responded, "This is inappropriate. Go have a seat." ECF 84-29 at 38. He went to the waiting room for Officer McKinney to sign his medical pass. *Id.* About thirty minutes later, Mr. Matlock saw Dr. Jackson leave his office and asked how he would be able to speak with him, and Dr. Jackson told him to submit a medical request. *Id.*; ECF 1 at 6. Dr. Jackson went into Nurse Practitioner Kupferberg's office, and they came out after a couple minutes. *Id.* at 6-7. Dr. Jackson pointed out Mr. Matlock to Nurse Practitioner Kupferberg, and they both asked Officer McKinney to issue Mr. Matlock a conduct report for disruptive behavior. *Id.*; ECF 87-1 at 4. Dr. Jackson said that "he would not see [Mr. Matlock] now or ever." ECF 1 at 6-7. Mr. Matlock told Dr. Jackson that he had denied him medical attention and that the denial amounted to "deliberate indifference and cruel & unusual punishment." *Id.* Nurse Practitioner Kupferberg responded to Mr. Matlock that "[he] files grievance but that staff can write [him] up." *Id.* A nurse suggested that Dr. Jackson walk away, and he did. *Id.* Officer McKinney issued the conduct report and listed Dr. Jackson, Nurse Practitioner Kupferberg, and a nursing assistant as witnesses. ECF 84-12.

According to Nurse Practitioner Kupferberg, Mr. Matlock disagreed with her assessment regarding his high cholesterol and became uncooperative. ECF 84-4 at 4-5; ECF 84-10; ECF 84-11. He refused to discuss anything other than his demand for famotidine and pain medication free of charge, and she asked him to leave. *Id.* She observed that Mr. Matlock wore new knee braces and watched him walk at a brisk, steady pace for about one hundred yards and transition from walking, sitting, and standing without any apparent difficulty. *Id.* She further noted that one of her colleagues would assume responsibility for Mr. Matlock's medical care due to his uncooperative behavior, and she did not treat him thereafter. *Id.*

According to Dr. Jackson, Mr. Matlock barged into his office through a curtain door without a warning and aggressively made demands in reference to his appointment with Nurse Practitioner Kupferberg, and Dr. Jackson asked him to leave. ECF 84-1 at 3-4. Mr. Matlock approached him again in the waiting room to discuss the appointment, but Dr. Jackson told him that discussing his medical care in front of other patients was inappropriate. *Id.* Neither Dr. Jackson nor Nurse Practitioner Kupferberg were aware of Mr. Matlock's grievances. *Id.* at 5; ECF 84-4 at 6. According to Officer McKinney's conduct report, Nurse Practitioner Kupferberg informed Officer McKinney of Mr. Matlock's inappropriate interactions with her and Dr. Jackson, and Officer McKinney "had to ensure [Mr. Matlock] left [the outpatient clinic]." ECF 84-12.

On March 18, Mr. Matlock had severe knee pain. ECF 1 at 11-12. According to Mr. Matlock, Nurse Murphy examined his knee and told him that she had to email Nurse Practitioner Kupferberg for medical orders. *Id.* She told him that Nurse Practitioner

Kupferberg told her to refuse to treat him and to purchase aspirin from the commissary. *Id.*

From September 2018 through March 2019, Mr. Matlock received a monthly average deposit of $111.49 into his prison account. ECF 2. At the commissary, a package of famotidine or pain medication costs about eight dollars. ECF 84-29 at 31. A month-long supply of famotidine would cost fifteen to twenty dollars per month if he purchased it from the commissary. *Id.* at 59. From November 2018 to May 2019, Mr. Matlock frequently purchased spicy foods from the commissary, including chili ramen noodle soup, hot turkey chili, Cajun chicken ramen noodle soup, jalapeno cheese dip, sliced jalapeno peppers, hot chili with beans, spicy corn chips, jalapeno cheese bar, jalapeno chips, and picante beef ramen noodle soup. ECF 84-17. He did not eat these foods but instead traded them for famotidine and pain medication because it was cheaper than purchasing them from the commissary. ECF 84-29 at 30-31, 59; ECF 87 at 1; ECF 90 at 1. Over the course of these six months, he spent more than four hundred dollars at the commissary. ECF 84-17.

Warden Neal received Mr. Matlock's complaints regarding his medical care and discussed them with medical staff to verify that they had provided him with adequate medical care. ECF 80-1. Administrator Lewis received additional complaints from Mr. Matlock, but she referred to his medical records, deferred to medical staff who had personally treated Mr. Matlock, and instructed him to express his medical concerns during sick call. ECF 84-22, ECF 84-23, ECF 84-24, ECF 84-25, ECF 84-26.

In Mr. Matlock's surreply, he suggests that sanctions may be appropriate because the defendants did not cooperate during discovery and refused to respond to any of his discovery requests. The electronic docket reflects that the defendants responded to each of the discovery requests filed with the court and directed at the defendants. ECF 28, ECF 45, ECF 46, ECF 48. He also states that he did not receive a response to his proposed non-party subpoena to Bob Busher of the Indiana Department of Correction for emails. ECF 19. The court declined to issue this proposed subpoena, reasoning that Mr. Matlock needed first to attempt to obtain the emails from the defendants in a request for production under Fed. R. Civ. P. 34. ECF 22. Based on the electronic docket, Mr. Matlock did not serve any requests for production on the defendants. Accordingly, the court concludes that the defendants satisfied their discovery obligations and that no discovery sanctions are warranted.

## STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and

draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

## DISCUSSION

Mr. Matlock asserts an Eighth Amendment claim against Nurse Practitioner Kupferberg, Dr. Jackson, Administrator Lewis, and Warden Neal for acting with deliberate indifference toward his medical needs. Under the Eighth Amendment, inmates are entitled to constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a

7

medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Under the law:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). When the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Mr. Matlock contends that the defendants acted with deliberate indifference by refusing to provide him with famotidine. "[T]he Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." *Poole v. Isaacs*, 703 F.3d 1024, 1026 (7th. Cir. 2012). The record reflects that Mr. Matlock had the funds to purchase famotidine from the commissary. Though he declined to purchase the medication from the commissary, he obtained it at a lower cost by trading food to other inmates. Because Mr. Matlock had ample access to famotidine, the defendants did not act with deliberate indifference to his serious medical needs by refusing to provide it to him free of charge.

Mr. Matlock also contends that the defendants acted with deliberate indifference by refusing to address his knee pain. The record reflects that, after learning that Mr. Matlock had lost his knee braces, she reviewed his medical records, found no orders for knee braces, but explained to him that he could obtain them through sick call. Shortly thereafter, Mr. Matlock received new knee braces. With respect to the appointment on March 5, 2019, Mr. Matlock testified that he asked Nurse Practitioner Kupferberg if they could discuss his knee arthritis and that she declined to do so. Nurse Practitioner Kupferberg construed this request as a complaint about not receiving pain medication free of charge and further observed no need for immediate medical care based on his ability to walk, sit, and stand and his new knee braces. Though Mr. Matlock alleges that Nurse Practitioner Kupferberg instructed him to purchase pain medication from the commissary on March 18, she denied providing him any care after March 5, and he supports his allegation only with inadmissible hearsay. *See* Fed. R. Evid. 802.

The record contains no evidence that Dr. Jackson knew of Mr. Matlock's knee pain in March 2019, and Warden Neal and Administrator Lewis did not act with deliberate indifference by deferring to Mr. Matlock's treatment providers. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (holding that wardens and grievance officers are "entitled to relegate to the prison's medical staff the provision of good medical care."). Therefore, the motions for summary judgment is granted with respect to the Eighth Amendment claim of deliberate indifference to serious medical needs against all defendants.

Mr. Matlock asserts a First Amendment claim against Nurse Practitioner Kupferberg and Dr. Jackson for refusing to treat his knee and for writing him up for insubordination in retaliation for filing a grievance. "To prevail on his First Amendment retaliation claim, [a plaintiff] must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). The record indicates that Dr. Jackson was not aware of Mr. Matlock's grievances. Further, as detailed above, the record does not indicate that Nurse Practitioner Kupferberg acted inappropriately with respect to Mr. Matlock's knee pain.

The defendants argue that the court should disregard Mr. Matlock's attestations regarding Nurse Practitioner Kuperferberg's references to his grievances before he received the conduct report on March 5, 2019. They state that Mr. Matlock did not mention these references in correspondence to administrative staff but instead represented that he merely believed that the grievances motivated her conduct or that

10

she retaliated against him for his verbal grievances during the appointment. They state that Mr. Matlock raised the express references to his formal grievance for the first time in the complaint. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *Scott* held that lower courts should have disregarded the plaintiff's testimony regarding a traffic incident at the summary judgment stage because an unaltered video recording of the traffic incident clearly contradicted it. *Id.* at 378-81. The court finds Mr. Matlock's inconsistent narrative to be dissimilar to clearly contrary video evidence and declines to disregard these attestations at the summary judgment stage. Nor is the court convinced by the defendants' argument that a conduct report would not deter an inmate of ordinary infirmness from exercising his First Amendment rights even if Mr. Matlock cannot recall the sanctions.

The defendants also argue that they are entitled to summary judgment because, in light of Mr. Matlock's misconduct, he would have been issued a conduct report even if he had not filed any grievances.

> [T]he burden of proof relating to causation is divided between the parties in First Amendment tort cases. To make a prima facie showing of causation the plaintiff must show only that the defendant's conduct was a sufficient condition of the plaintiff's injury. The defendant can rebut, but only by showing that his conduct was not a necessary condition of the harm—the harm would have occurred anyway.

*Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). "A prisoner who has evidence that officials were motivated to discipline the prisoner because of protected speech cannot

11

prevail if the officials show, without contradiction, that they would have disciplined him anyway for a legitimate reason." *Harris v. Walls*, 604 F. App'x 518, 521 (7th Cir. 2015). "In that case, the improper motive would have done no work, had no effect, left the world unchanged." *Id.*

The record reflects that Dr. Jackson and Officer McKinney agreed with Nurse Practitioner Kupferberg that Mr. Matlock's behavior warranted a conduct report but contains no evidence that they knew that Mr. Matlock had submitted a grievance. Further, the record demonstrates that Dr. Jackson rather than Nurse Practitioner Kupferberg initiated the conduct report. According to Mr. Matlock, after he solicited Dr. Jackson in the waiting room, Dr. Jackson went into Nurse Practitioner Kupferberg's office, quickly returned to the waiting area with her, identified Mr. Matlock as the culprit, asked for a conduct report, and told Mr. Matlock that he would never see Mr. Matlock as a patient. Notably, Nurse Practitioner Kupferberg did not ask for a conduct report immediately after ending the appointment despite her frustration with Mr. Matlock and her awareness of his grievance. To the contrary, the record reflects that she requested the conduct report about thirty minutes later and only after Dr. Jackson, her supervisor and expressed concern about her patient's behavior, pointed him out and only when he also requested a conduct report. Officer McKinney granted the request and added that Mr. Matlock's behavior forced her to ensure that he left the clinic. Given this sequence of events, the court finds that Mr. Matlock would have received a conduct report for his behavior even if he had never submitted a grievance about his medical care. Therefore,

the motion for summary judgment is granted with respect to the First Amendment claim of retaliation. No other claims remain.

For these reasons, the court:

(1) GRANTS the motions for summary judgment (ECF 79, ECF 80); and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and to close this case.

SO ORDERED.

October 21, 2020                                    *s/ Damon R. Leichty*
                                                                Judge, United States District Court